**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Arthur Sheridan, an individual, and Barbara Sheridan, an individual, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>Sirius XM Radio Inc., a Delaware corporation; and Pandora Media, Inc., a Delaware corporation,<br><br>      Defendants. | Case No. 1:15-cv-07056<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

## I.    INTRODUCTION[1]

1.    Every satellite and internet radio service must ensure that its broadcasts of copyrighted sound recordings are authorized and must arrange to pay royalties before it publicly performs the sound recordings.  Every satellite and internet radio service must also arrange to pay royalties to the owner of a sound recording each time the service reproduces the sound recording for purposes of archiving it, maintaining it, and streaming it online. If the radio service fails to arrange and pay required royalties, the use is unauthorized and infringes the sound recording's copyright. Further, the use of the names, voices, and likenesses of recording artists to promote illegal, unauthorized, and uncompensated broadcasts of sound recordings violates the recording owner's right to exploit those publicity rights. Although federal copyright law provides an automatic license and royalty rate for digital public performances of sound recordings created on or after February 15, 1972, no such automatic license exists for recordings created before that date. Instead, state law prohibits the unauthorized reproduction and performance of pre-1972 sound recordings.

2.    Arthur Sheridan and Barbara Sheridan (collectively, "Plaintiffs") are suing Sirius XM Radio, Inc. ("Sirius") and Pandora Media, Inc. ("Pandora") (collectively, "Defendants") for their unauthorized and unlawful use of sound recordings initially created before February 15, 1972 (the "Pre-1972 Recordings" or the "Recordings"), and the unauthorized exploitation of publicity rights held by or licensed to Plaintiffs in connection therewith.

3.    Defendants have violated and continue to violate Plaintiffs' rights under New York law through the marketing, sale, and provision of satellite and internet radio

---

[1] Plaintiffs, by and through their attorneys, based on their individual experiences, make these allegations based on the investigation of counsel, and upon information and belief.

services that include Pre-1972 Recordings. This practice unjustly enriches Defendants at the expense of Plaintiffs and class members.

4.      Defendants must pay royalties for the use of sound recordings created *on or after* February 15, 1972, which are copyrighted under the Copyright Act of 1976 (the "Copyright Act" or the "Act"). The Act does not, however, extend federal copyright to sound recordings created *before* February 15, 1972, but specifically provides that states remain free to create remedies for unauthorized use of those Pre-1972 Recordings.

5.      Despite their widespread public performance and reproduction of Pre-1972 Recordings protected by state law, Defendants have failed to obtain authorization and pay royalties. Nor do Defendants pay for the publicity rights associated with the use of artists' names, voices, and likenesses in the marketing and provision of their satellite and internet radio services.

6.      Pre-1972 sound recordings and the public images of the artists behind those recordings redefined popular music in America. Defendants have earned substantial revenue by creating, marketing, and selling subscriptions and advertisements in connection with radio services featuring Pre-1972 Recordings owned by Plaintiffs. But despite the fact that Defendants profit handsomely by advertising and offering these sound recordings to the public, they unlawfully fail to arrange for permission to use (for compensation or otherwise) the sound recordings—or to pay for the use of the names, voices, and likenesses of the sound recording artists. Defendants have traded on the rights of Plaintiffs and class members to enhance the revenue and popularity of their radio services.

7.      Defendants' conduct violates Plaintiffs' rights under New York's statutory right of publicity as well as New York common law prohibitions of misappropriation, unfair competition, and unjust enrichment. Plaintiffs seek, on behalf of themselves and a class of similarly situated rights holders, compensation from Defendants as well as

injunctive relief for violations of Plaintiffs' rights flowing from the unauthorized and uncompensated use of the Pre-1972 Recordings and publicity rights.

## II.   JURISDICTION AND VENUE

8.   This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1322(d), because at least one class member is of diverse citizenship from Defendants, there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000.

9.   The Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to this Court's jurisdiction. This Court has personal jurisdiction over Defendants because Defendants mass-solicit New York customers through their interactive websites www.pandora.com and www.siriusxm.com and on-air advertising. Defendants' internet and satellite radio services are well known and popular in the District. Defendants frequently violate New York law to the detriment of Plaintiffs, class members, and listeners, as detailed below, by publicly performing Pre-1972 Recordings in New York without arranging or paying royalties. This court further has personal jurisdiction over Defendant Sirius because Sirius has its principal place of business in New York.

10.   Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District and Defendants have caused harm to class members residing in this District.

## III.   PARTIES

11.   Plaintiff Arthur Sheridan is a citizen of Illinois and record producer who owns the intellectual property and contract rights in numerous pre-1972 master recordings. Arthur Sheridan possesses licenses to use the publicity rights of recording artists to promote the Pre-1972 Recordings that he owns.

12.   Plaintiff Barabara Sheridan is a citizen of Illinois and owns the intellectual property and contract rights in a pre-1972 master recording. Barbara Sheridan possesses a

license to use the publicity rights of recording artists to promote the Pre-1972 Recording that she owns.

13.     Defendant Pandora Media, Inc., is a Delaware corporation with its principal place of business in Oakland, California. Pandora Media, Inc. owns and operates an internet radio service as alleged throughout this Complaint.

14.     Defendant SiriusXM Radio Inc. is a Delaware corporation with its principal place of business in New York, New York. SiriusXM Radio Inc. owns and operates satellite and internet radio services as alleged throughout this Complaint.

15.     With respect to the right of publicity, unfair competition, and unjust enrichment claims, Plaintiffs bring this action individually and on behalf of the Publicity Rights Class as defined below.

16.     With respect to the common law copyright, unfair competition, and unjust enrichment claims, Plaintiffs bring this action individually and on behalf of the Misappropriation Class as defined below.

## IV.     FACTUAL BACKGROUND

### A.   Arthur and Barbara Sheridan

17.     In the 1950s and 1960s, Arthur Sheridan owned and operated several recording companies specializing in recording and selling doo-wop, jazz, and rhythm and blues music. These music labels produced recordings by some of the most influential musicians of the era, including the Flamingos (inducted to the Rock and Roll Hall of Fame in 2001), Little Walter (inducted to the Blues Hall of Fame in 1986 and the Rock and Roll Hall of Fame in 2008), and the Moonglows (inducted to the Vocal Group Hall of Fame in 1999 and the Rock and Roll Hall of Fame in 2000).

18.     Arthur Sheridan owns many pre-1972 master recordings, including but not limited to the following fixtures of jazz, blues, and doo-wop music: "Slow Down Woman," "The Mojo," "I Want my Baby," and "How Can I Leave" by J.B. Lenoir; "That's My Desire" and "You Ain't Ready" by The Flamingos; "Evening Sun" by

Johnny Shines, "Love is a Pain," "No Need of Your Crying," "I Had a Feeling" and "Meet Me Baby" by Rudy Greene; "Nervous Wreck" and "No More Love" by Willie Nix; "Just a Lonely Christmas," "Whistle My Love," "Baby Please," and "Hey Santa Claus" by The Moonglows; "She Is Going to Ruin Me" and "I Can't Stand Being Away From You" by T-Bone Walker; "I Just Keep Loving Her" by Little Walter; "Merry Lee," "Down Home," "Sweet and Lovely," and "The Talk of the Town" by Howard McGhee; and "High and Lonesome" and "Roll and Rhumba" by Jimmy Reed.

19.     Barbara Sheridan owns the pre-1972 master sound recording of "Golden Teardrops" by The Flamingos, critically acclaimed when it was recorded and still regarded as a classic.

20.     Arthur and Barbara Sheridan own the intellectual property and contract rights associated with the recordings. These rights include, without limitation, the right to control the use and distribution of the recording, the right to use the publicity rights, including the well-known voices, names, images, and likenesses of recording artists such as the Flamingos and Little Walter, the right to promote the recordings, and the right to receive royalty payments from the exploitation of the master recordings described above. The publicity rights of the recording artists behind the recordings are valuable and highly sought-after by commercial entities.

21.     Arthur and Barbara Sheridan continue to market the Pre-1972 Recordings that they own. In particular, Arthur and Barbara Sheridan continue to receive revenue from licenses granted to third parties to publicly perform the recordings.

### B.     Defendants Exploit Plaintiffs' and Class Members' Rights Without Permission or Compensation

#### 1.  State Law Protection for Pre-1972 Recordings

22.     The Copyright Act creates a federal statutory licensing scheme pursuant to which satellite and internet radio companies such as Defendants are required to pay royalties for the public performance of sound recordings protected by the Act. *See* 17

U.S.C. §§ 112(e), 114(d)(2), 114(f).  The companies pay these royalties to SoundExchange, a nonprofit entity established by regulation for the collection and distribution of royalty payments under this scheme.

23.     The statutory licensing scheme provided by 17 U.S.C. §§ 112(e), 114(d)(2), and 114(f) does not extend to Pre-1972 Recordings. Thus, SoundExchange's authority does not extend to the collection and distribution of royalty payments to the owners of copyrights in Pre-1972 Recordings. *See* 17 U.S.C. § 114(g)(2) (requiring SoundExchange to distribute royalties to holders of federal copyrights). The existence of SoundExchange does not alter the issues presented in this action because SoundExchange has no authority to negotiate or collect royalties on behalf of copyright holders for the reproduction and public performance of Pre-1972 Recordings.

24.     The Copyright Act specifically provides that Pre-1972 Recordings will not be subject to federal copyright. 17 U.S.C. § 301(c). But nothing in the Copyright Act permits entities such as Defendants to make use of Pre-1972 Recordings without compensation, or to exploit the names, voices, or likenesses of persons connected with Pre-1972 Recordings without authorization in order to market, sell advertising on, and provide satellite and internet radio services. Indeed, the Copyright Act specifically left states free to regulate the use of works of authorship that it chose not to render subject to federal law. 17 U.S.C. § 301(b)(1).

25.     New York common law protects Pre-1972 Recordings from being copied, distributed, or otherwise exploited without license or authorization.

## 2. Sirius XM

26.     Sirius offers satellite and internet music services consisting of almost 1000 different "channels" distinguished by type of content and ranging across music, sports, and news.

27.   Sirius is a highly profitable company that derives substantial revenue from the intellectual property and publicity rights embodied in the music it plays and in its marketing of that music.

28.   A substantial number of Sirius channels are devoted exclusively to music, with many of these music channels featuring Pre-1972 Recordings. Indeed, Sirius channels 3 through 9 currently feature decade-specific music playlists featuring *only* Pre-1972 Recordings, including "'40s on 4," "'50s on 5," and "'60s on 6."

29.   Sirius advertises its services using the names of numerous popular artists associated with each channel, including, on information and belief, names belonging to many Class Members.

30.   Users purchase access to Sirius channels in the form of various subscription packages, which allow access to Sirius channels using either a satellite radio receiver or an internet device such as a computer, digital media device, tablet, or smartphone. Sirius's services also permit users to download and replay tracks that have been performed on a particular channel, download particular sound recordings, access and replay specific portions of sound recordings, and download specific sound recordings as part of an "On Demand" feature.

31.   Sirius's music services are delivered by way of satellite and web interfaces which promote Sirius's services or are designed to attract users and subscribers to Sirius's services.

32.   Sirius regularly broadcasts to listeners the "Golden Teardrops" recording and other recordings listed above, as well as many other Pre-1972 Recordings, and has done so repeatedly for the last several years.

33.   Sirius has not licensed Pre-1972 Recordings from their copyright owners.

34.   The Pre-1972 Recordings played by Sirius exploit Plaintiffs' and class members' rights of publicity in the voices of the artists featured in those Recordings.

35.     In addition to the voices of artists featured in Pre-1972 Recordings, Sirius displays on its website the names and likenesses of artists featured in Pre-1972 Recordings.  Pre-1972 Recording artist names and likenesses appear on web interfaces which promote Sirius's services or are designed to attract users and subscribers to Sirius's services.  Sirius also displays Pre-1972 Recording artist names in the provision of its satellite music services.

36.     In the course of broadcasting satellite and internet radio services that feature Pre-1972 Recordings, Sirius reproduces those Recordings multiple times for purposes of archiving, advertising, buffering, streaming, and otherwise maintaining, accessing, and performing the Recordings.

37.     Generally, Sirius's subscription packages require users to pay monthly fees—currently, $14.99 or $19.99 per month—which generate significant revenues for Sirius.

38.     Sirius advertises that its music services, both satellite and internet, can be accessed throughout the United States, including New York. As of the end of 2014, Sirius reports having over 27.3 million subscribers, millions of whom, on information and belief, are located in New York.

39.     In the context of rate-setting proceedings for the statutory licensing scheme associated with federal copyrights, Sirius has sought to justify an exclusion of revenue that it attributed to Pre-1972 Recordings in its calculation of statutory royalty payments to SoundExchange.

40.     But Sirius also has not separately licensed Pre-1972 Recordings from Plaintiffs or other Class Members who own the rights to reproduce, distribute, publicly perform, and otherwise exploit the Recordings. Nor has Sirius separately licensed the right, for Pre-1972 Recordings, to use musicians' names, voices, or likenesses in the provision and marketing of its services.

41.     Thus, without obtaining authorization or rendering compensation, Sirius has reproduced and publicly performed Pre-1972 Recordings created and/or owned by

8

Plaintiffs and other Class Members, deriving significant benefits—including millions of dollars in annual revenue— from its unlawful use of their recordings and publicity rights.

### 3. *Pandora Internet Radio*

42.     Pandora offers internet radio services in the form of customizable music "stations" that stream music to users on the internet. Many Pandora stations feature, in whole or in part, Pre-1972 Recordings.

43.     Pandora offers its services to the public on both a subscription and non-subscription basis. Users without a subscription hear advertisements at periodic intervals between tracks, and may skip only six tracks per station per hour (and twelve tracks total per day) across all stations. Users with a subscription are promised "ad-free listening" and may skip a greater number of tracks per day. Users can access Pandora on a variety of internet platforms including computers, digital media devices, tablets, and smartphones.

44.     Pandora's internet music service is delivered by way of web interfaces which promote Pandora's services or are designed to attract users and subscribers to Pandora's services.

45.     Pandora regularly broadcasts to listeners the "Golden Teardrops" recording and other recordings listed above, as well as many other Pre-1972 Recordings, and has done so repeatedly for the last several years.

46.     Pandora has not licensed Pre-1972 Recordings from their copyright owners.

47.     The Pre-1972 Recordings played by Pandora exploit Plaintiffs' and class members' rights of publicity in the voices of the artists featured in those Recordings.

48.     In addition to the voices of artists featured in Pre-1972 Recordings, Pandora displays on its website the names and likenesses of artists featured in Pre-1972 Recordings.  Pre-1972 Recording artist names and likenesses appear on web interfaces which promote Pandora's services or are designed to attract users and subscribers to Pandora's services.

49.     Pandora offers users a choice between monthly and yearly subscriptions. In either case, subscribers pay a periodic fee for the use of Pandora's service. Pandora currently offers paid subscriptions at $54.89 per year, or $4.99 per month.

50.     Pandora also sells the right to advertise to users on its stations, websites, and applications.

51.     Pandora's internet radio service can be accessed throughout the United States, including New York. As of 2015, Pandora reports having over 250 million registered users of its internet music service. Pandora further reports over 3.3 million paying subscribers.  Upon information and belief, millions of Pandora users and hundreds of thousands of paying Pandora subscribers are located in New York.

52.     Sales of subscriptions and advertisements generate millions of dollars of revenue for Pandora each year.

53.     In the course of broadcasting internet radio services that feature Pre-1972 Recordings, Pandora reproduces those Recordings multiple times for purposes of archiving, advertising, buffering, streaming, and otherwise maintaining, accessing, and performing the Recordings.

54.     But despite the fact that Pandora's service includes Pre-1972 Recordings, and despite the fact that Plaintiffs and other Class Members own the rights to reproduce, distribute, publicly perform, and otherwise exploit the Recordings—Pandora has not paid for a license to use the Recordings. Nor is Pandora licensed, for Pre-1972 Recordings, to use musicians' names, voices, or likenesses in the provision and marketing of its services.

55.     Thus, without obtaining authorization or rendering compensation, Pandora has reproduced and publicly performed Pre-1972 Recordings created and/or owned by Plaintiffs and other Class Members, deriving significant benefits—including millions of dollars in annual revenue— from its unlawful use of Plaintiffs' and Class Members' sound recordings and publicity rights.

## V.   CLASS ACTION ALLEGATIONS

### A.   Misappropriation Class Allegations

56.   Plaintiffs Arthur and Barbara Sheridan bring this action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on their own behalf and on behalf of the following class of plaintiffs (the "Misappropriation Class"):

> All owners of reproduction and public performance rights in Pre-1972 Recordings that have been publicly performed, copied, or otherwise exploited by Defendants, without a license or other authorization, in the marketing, sale, and provision of satellite and internet radio services.

57.   The persons in the Misappropriation Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Misappropriation Class is easily ascertainable, as each class member can by identified by using Defendants' records. Plaintiffs are informed and believe that there are many thousands of Misappropriation Class members.

58.   There are common questions of law and fact specific to the Misappropriation Class that predominate over any questions affecting individual members, including:

a) Whether Defendants copy, publicly perform, or otherwise exploit Pre-1972 Recordings in their satellite and internet radio services without authorization or permission;

b) Whether such uses are unlawful;

c) Whether Defendants' conduct constitutes misappropriation;

d) Whether Defendants' conduct constitutes unfair competition;

e) Whether Defendants' conduct constitutes conversion;

f) Whether class members have been damaged by Defendants' conduct, and the amount of such damages;

g) Whether punitive damages are appropriate and the amount of such damages;

h) Whether an order enjoining future unauthorized use of Pre-1972 Recordings in satellite and internet radio services is appropriate and on what terms;

i) Whether Defendants have been unjustly enriched; and

j) Whether Defendants should disgorge their unlawful profits, and the amount of such profits.

59.     Plaintiffs' claims are typical of the Misappropriation Class's claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Misappropriation Class, and Plaintiffs challenge the practices and course of conduct engaged in by Defendants with respect to the Misappropriation Class as a whole.

### B.    Publicity Rights Class Allegations

60.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3) on their own and on behalf of the following class of plaintiffs (the "Publicity Rights Class"):

> All owners of rights of publicity—including, without limitation, the rights to control, license, limit, or otherwise exploit the use of the name, voice, photograph, or likeness— of any person who performed in Pre-1972 Recordings that were used by Defendants, and whose rights of publicity were used by Defendants without a license or other authorization, in the marketing, sale, and provision of satellite and internet radio services.

61.     The persons in the Publicity Rights Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Publicity Rights Class is easily ascertainable, as each class member can be identified by using Defendants' records. Plaintiffs are informed and believe that there are many thousands of Publicity Rights Class members.

62.     There are common questions of law and fact specific to the Publicity Rights Class that predominate over any questions affecting individual members, including:

a)   Whether Defendants utilize the names, voices, photographs, or likenesses of any person performing in a Pre-1972 Recording;

b)   Whether such uses are unlawful;

c)   Whether Defendants' conduct violates New York Civil Rights Law § 51;

d)   Whether Defendants' conduct constitutes unfair competition;

e)   Whether class members have been damaged by Defendants' conduct and the amount of such damages;

f)   Whether punitive damages are appropriate and the amount of such damages;

g)  Whether an order enjoining future violations of publicity rights is appropriate and on what terms;

h)  Whether Defendants have been unjustly enriched; and

i)  Whether Defendants should disgorge their unlawful profits and the amount of such profits.

63.  Plaintiffs' claims are typical of the Publicity Rights Class's claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Publicity Rights Class, and Publicity Rights Plaintiffs challenge the practices and course of conduct engaged in by Defendants with respect to the Class as a whole.

### C.  Allegations Pertaining to Both Classes

64.  Excluded from both classes are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and associated court staff assigned to this case.

65.  Plaintiffs will fairly and adequately protect the interests of both classes. They will vigorously pursue the claims and have no antagonistic conflicts. Plaintiffs have retained counsel who are able and experienced class action litigators and are familiar with representing plaintiffs in large-scale copyright, trademark, and right of publicity claims.

66.  Defendants have acted or refused to act on grounds that apply generally to both classes, and final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. A class action is also appropriate because Defendants have acted and refused to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to both classes as a whole.

67.  Questions of law or fact common to class members predominate over any questions affecting only individual members. Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation no individual class member can

justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants. Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of class members to pursue their claims. It is not anticipated that there would be difficulties in managing this case as a class action.

68.     Plaintiffs reserve the right to amend all class allegations as appropriate, and to request any state law subclasses or other subclasses if necessary, upon completion of class-related discovery and motions for class certification.

## COUNT I
### (Common Law Copyright Infringement)

69.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

70.     Plaintiffs, the Misappropriation Class, and/or their predecessors-in-interest spent substantial time, skill, effort, and money to create the Pre-1972 Recordings, and Plaintiffs and the Misappropriation Class have property interests in them as recognized by New York common law.

71.     By duplicating the Pre-1972 Recordings without authorization from Plaintiffs and Class Members, and publicly performing those Recordings to their users for their own gain, Defendants engaged in the misappropriation of the Plaintiffs' and Class Members' valuable work product and/or intellectual property rights, whereby Defendants profited to the disadvantage of the Plaintiffs and Class Members, who have been and continue to be injured by Defendants' conduct.

72.     As a result of Defendants' misappropriation of the Pre-1972 Recordings, Plaintiffs and Class Members are entitled to an order enjoining Defendants from continuing to use those recordings without authorization and compensation, and to an order imposing a constructive trust on any money acquired by means of Defendants'

misappropriation, including all gross receipts attributable to Defendants'
misappropriation of the Pre-1972 Recordings.

73.     Defendants' conduct, as described above, constituted a continuous and
intentional pattern of misappropriation of Plaintiffs' and Class Members' property,
justifying the imposition of punitive damages. Defendants are high-profile, large-scale
media companies that are intimately familiar with the mechanics of the music industry
and the requirements of intellectual property law. By knowingly misappropriating works
without their owners' permission and performing these works to millions of users of
satellite and internet radio services, Defendants acted and continue to act maliciously and
oppressively to injure Plaintiffs and Class Members by depriving them of compensation
for the use of the Pre-1972 Recordings. Defendants' continued misappropriation of the
Pre-1972 Recordings was at a minimum reckless and in wanton disregard of Plaintiffs'
and Class Members' ownership rights in those Recordings.

## COUNT II
### (Violation of Rights of Publicity Under New York Civil Rights Law § 51)

74.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if
fully set forth herein.

75.     Defendants have knowingly and intentionally used and continue to use the
publicity rights of Plaintiffs and the Publicity Rights Class, including names, voices, and
likenesses, for the purposes of advertising Defendants' satellite and internet radio
services; providing those radio services; selling subscriptions and advertisements in
connection with those radio services; and/or advertising and selling other products and
services.

76.     Defendants are high-profile, large-scale media companies, intimately familiar
with the mechanics of the music industry and the law governing rights of publicity.
Defendants' actions, as described herein, were committed maliciously, oppressively,
intentionally, fraudulently and with at least a reckless and wanton disregard of the rights

of Plaintiffs and the Publicity Rights Class, making an award of punitive damages appropriate in order to punish and deter Defendants from continuing to engage in the conduct alleged herein.

77.     As a result of Defendants' violation of their publicity rights, Plaintiffs and the Publicity Rights Class have been injured.

**COUNT III**
**(Unfair Competition)**

78.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

79.     Defendants' conduct, as alleged above, constituted and constitutes unfair competition under New York law. Acting for its own commercial benefit, Defendants have misappropriated the labors and expenditures of Plaintiffs, the Misappropriation Class, and the Publicity Rights Class.

80.     Plaintiffs and the Misappropriation Class have expended significant time, skill, effort and money in the creation of the Pre-1972 Recordings, which constitute unique and commercially valuable intellectual property protected under New York law.

81.     The publicity rights held by Plaintiffs and the Publicity Rights Class also have considerable commercial value, deriving from the Pre-1972 Recording artists' stature and fame in American popular culture. Plaintiffs and the Publicity Rights class have expended significant time, skill, effort and money in the creation, ownership, and protection of commercially valuable names, voices, and likenesses.

82.     Defendants have acted in bad faith by reproducing, publicly performing, and otherwise exploiting the Pre-1972 Recordings and using the name, voice, and likeness rights of the Publicity Rights class in the conduct and promotion of their unlawful activities.

83.     Defendants' unlawful conduct further misleads the public as to the legality of the services Defendants provide and gives Defendants an unfair competitive advantage in

the market for satellite and internet radio services and advertising, to the detriment of Plaintiffs and Class Members.

84.     Defendants' misappropriation of the Pre-1972 Recordings and violation of Plaintiffs' rights to use the publicity rights of recording artists associated with the Pre-1972 Recordings has caused Plaintiffs and Class Members substantial injury, including without limitation foregone licensing opportunities and royalty payments.

85.     Defendants' misappropriation of the Pre-1972 Recordings and violation of Plaintiffs' rights to use the publicity rights of recording artists associated with the Pre-1972 Recordings has further caused and is causing irreparable injury to Plaintiffs and Class Members. Plaintiffs and Class Members are therefore entitled to an order enjoining Defendants from continuing to use the Recordings without authorization and compensation, and to an order requiring Defendants to make restitution of and disgorge any money acquired by means of Defendants' conduct, including all gross receipts attributable to Defendants' misappropriation of the Pre-1972 Recordings and names, voices, and likenesses held by Plaintiffs and Class Members.

**COUNT IV**
**(Unjust Enrichment)**

86.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

87.     To the detriment of Plaintiffs and the Class, Defendants have been and continue to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein. Defendants have unjustly benefitted through the sale of subscriptions and advertisements in connection with their satellite and internet radio services that use without authorization the Pre-1972 Recordings and the names, voices, and likenesses of recording artists, and have also used such publicity rights in the advertising and marketing of those services—leveraging for profit the valuable publicity rights of Plaintiffs and the Class.  Defendants have therefore benefitted from the use of Pre-1972

Recordings, as well as the name, voice, and likeness rights of Plaintiffs and the Publicity Rights Class.

88.     Defendants have intentionally used and continue to use Pre-1972 Recordings owned by Plaintiffs and Misappropriation Class Members without license or authorization. Defendants have intentionally used and continue to use names, voices, and likenesses of recording artists associated with the Pre-1972 Recordings without Plaintiffs' or Class Members' consent.

89.     It would be unjust for Defendants to retain the benefits attained by their unlicensed and wrongful use of the Plaintiffs' Recordings and violations of Plaintiffs' rights to use the names, voices, and likenesses of recording artists associated with the Pre-1972 Recordings. Accordingly, Plaintiffs seek, on behalf of themselves and the Publicity Rights Class, full restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## MISAPPROPRIATION PRAYER FOR RELIEF

90.     WHEREFORE, on their own behalf and on behalf of the Misappropriation Class, Plaintiffs pray for judgment against Defendants as follows:

a)   Certification of the action as a Class Action pursuant to the Federal Rules of Civil Procedure, and appointment of Plaintiffs as the Class Representatives and their counsel of record as Class Counsel;

b)   Actual damages, punitive damages, and such other relief as provided by the statutes and common law cited herein;

c)   Disgorgement of all profits earned by Defendants from copying, publicly performing, and otherwise exploiting Pre-1972 Recordings in satellite and internet radio services;

d)   A constructive trust on any money acquired by means of Defendants' conversion, including all gross receipts attributable to Defendants' conversion of the Pre-1972 Recordings;

e)   Prejudgment and post-judgment interest on any monetary relief;

f)   Equitable relief enjoining future unauthorized use of Pre-1972 Recordings in satellite and internet radio services;

g)   The costs of bringing this suit, including reasonable attorneys' fees; and

h) All other relief to which Plaintiffs and class members may be entitled at law or in equity.

**RIGHT OF PUBLICITY PRAYER FOR RELIEF**

91.   WHEREFORE, on their own behalf and on behalf of the Publicity Rights

Class, Plaintiffs pray for judgment against Defendants as follows:

a) Certification of the action as a Class Action pursuant to the Federal Rules of Civil Procedure, and appointment of Plaintiffs as the Class Representatives and their counsel of record as Class Counsel;

b) Actual damages, punitive damages, and such other relief as provided by the statutes and common law cited herein;

c) Disgorgement of all profits earned by Defendants from the marketing, sale, and provision of satellite and internet radio services using names, voices, photographs, and likenesses of recording artists associated with the Pre-1972 Recordings;

d) A constructive trust on any money acquired by means of Defendants' violation of Plaintiffs' rights to use publicity rights, including all gross receipts attributable to Defendants' performance of the Pre-1972 Recordings;

e) Prejudgment and post-judgment interest on such monetary relief;

f) Equitable relief in enjoining future violations of publicity rights associated with the Pre-1972 Recordings in Defendants' satellite and internet radio services;

g) The costs of bringing this suit, including reasonable attorneys' fees; and

h) All other relief to which Plaintiffs and class members may be entitled at law or in equity.

Dated:                                        Respectfully Submitted,

                                               By:  s/ Jason A. Zweig
                                                   Jason A. Zweig

                                               HAGENS BERMAN SOBOL SHAPIRO LLP
                                               Jason A. Zweig
                                               555 Fifth Avenue, Suite 1700
                                               New York, NY 10017
                                               Telephone: (212) 752-5455
                                               Facsimile: (917) 210-3980
                                               jasonz@hbsslaw.com

                                               Steve W. Berman (*pro hac vice pending*)
                                               1918 Eighth Avenue, Suite 3300
                                               Seattle, Washington 98101
                                               Telephone: (206) 623-7292
                                               Facsimile: (206) 623-0594

steve@hbsslaw.com

Robert B. Carey (*pro hac vice pending*)
John M. DeStefano (*pro hac vice pending*)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rob@hbsslaw.com
johnd@hbsslaw.com

ABNER & FULLERTON LLP
Anthony L. Abner (*pro hac vice pending*)
32565 Golden Lantern Blvd., Suite 216
Dana Point, California 92945
Telephone: (323) 839-3291
Facsimile: (323) 656-7155
tonyabner@gmail.com

THE LAW OFFICE OF JUSTIN SOBODASH
Justin Sobodash (*pro hac vice pending*)
8335 West Sunset Blvd., Suite 302
West Hollywood, California 90069
Telephone: (323) 337-9010
Facsimile: (323) 656-7155
justin@Sobodashlaw.com

*Attorneys for Plaintiffs*